**SHEEHAN & ASSOCIATES, P.C.**
Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
(516) 303-0552
spencer@spencersheehan.com

United States District Court
Eastern District of New York                                    1:19-cv-04566

| | |
|---|---|
| Howard Haut, Jane Doe, individually and on behalf of all others similarly situated | |
| Plaintiffs | Complaint |
| - against - | |
| Glanbia Performance Nutrition (Manufacturing), Inc. | |
| Defendant | |

Plaintiffs by attorneys alleges upon information and belief, except for allegations pertaining to plaintiffs, which are based on personal knowledge:

1.    Glanbia Performance Nutrition (Manufacturing), Inc. ("defendant") manufactures, distributes, markets, labels and sells ready-to-eat ("RTE") oatmeal cups and packets under the ThinkThin and Think! brands ("Products").

2.    The Products are available to consumers nationwide from third-party retailers, including brick and mortar and online stores and directly from defendant's website.

3.    The Products are sold in 1.76 oz (50g) servings in the following sizes:

|  | Individually | Cases of 6+ |
|---|---|---|
| Cups | ✓ | ✓ |
| Packets | x | ✓ |

I.   Increased Consumption of Hot Cereals

4.      The market share of cold cereal among breakfast foods has been declining since 2001 due to (1) high levels of sugar, (2) increased awareness of obesity concerns and possible diabetes and (3) gluten sensitivity of approximately 3 million Americans.[1]

5.      According to BakeryandSnacks.com, "'hot' cereal products have stepped up to fill the gaps in the market' and meet consumers' evolving demand for reduced sugar, increased fiber, higher protein amounts and gluten-free options."

6.      This trend is reflected by the: [2]

(1) 60% of Americans who consume hot cereal each week, with 40% of this group consuming it multiples times per week;

(2) 8.5% increase in sales from 2008 to 2013; and

(3) 14.7% increase in sales from 2013 ($1.4 billion) to 2018 ($1.6 billion).

7.      Upon introduction of the Products to market, defendant's marketing personnel noted multiple reasons why hot oatmeal appealed to consumers and how the product line, and this Product, met those needs.[3]

| Positive Attributes | How Product Line Meets Consumer Demands | Application to Products |
|---|---|---|
| ✓ Satisfies hunger with fewer calories | ▪ "satiety benefits [from] fiber and protein…can keep calories low" | • 10g Protein<br>• 5g Fiber<br>• less than 200 calories |
| ✓ Addition of impactful unique flavors | ▪ due to neutral or bland oatmeal taste, "you can make it taste really, really good" | • Madagascar Vanilla |
| ✓ Inclusion of value-added | ▪ "you can add a lot of benefits" | • Almonds |

---

[1] Elizabeth Crawford, Can oatmeal save the cereal industry from slumping sales?, BakeryandSnacks.com, Mar. 23, 2015 citing Packaged Facts, Cold and Hot Breakfast Cereals in the U.S., Feb. 27, 2014
[2] https://www.packagedfacts.com/Cold-Hot-Breakfast-8056897/
[3] Crawford, supra.

| ingredients, such as nuts, other grains and berries | | • Pecans<br>• Red Quinoa |
| ✓ Short, easy to understand ingredient list, as opposed to cold cereals | ▪ "'you don't have to have a lot of things in the ingredients lists,' so it is easy to maintain a natural, clean label that appeals to consumers" | • Cane Sugar<br>• <mark>Ground Vanilla Beans</mark><br>• Almonds<br>• Pecans |

8. The relevant front label statements and images include (1) "Protein & Fiber Hot Oatmeal," (2) "Madagascar Vanilla, Almonds, Pecans," (3) "Naturally Flavored," (4) oatmeal cup with almonds and pecans, (5) vignettes of almonds, pecans, vanilla beans and vanilla orchid and (6) "10g Protein," "5g Fiber," and "190 Calories," also reflected on the Nutrition Facts.

<u>Front Label</u>                    <u>Nutrition Facts</u>

 

## II. Vanilla's Use in Food

9. Vanilla's "desirable flavor attributes…make it one of the most common ingredients used in the global marketplace, whether as a primary flavor, as a component of another flavor, or

3

for its desirable aroma qualities."[4]

10.     According to flavor scientists, "Consumers' insatiable appetite for this fragrant spice means that an estimated 18,000 products on the market contain vanilla flavor today, with prices for natural vanilla hovering around $300 per pound."[5]

11.     Though vanilla is used "by different regions and cultures in subtly different ways, it's a key ingredient in everything from cereal to Michelin-starred cuisine, and its popularity shows no sign of declining."[6]

12.     While traditionally vanilla has been mostly used in desserts, it has been increasingly used in other foods, "similar to [the ubiquity of] salt and pepper…to enhance food pleasure," because it "adds a spicy, delicate taste and packs a strong, enticing aroma."[7]

13.     Along with other "sweet spices" like "cinnamon, allspice and nutmeg, [and] extracts such as vanilla are moving up the menu from desserts to the main course," according to the global spice and flavoring company, McCormick & Co. Inc.[8]

14.     Vanilla "enhances the sweetness perception of foods," allowing a manufacturer to include less sugar, which appeals to most consumers, according to a product manager at a Midwest flavor company:

>     [I]f you had a product with and without vanilla, most people would perceive the one with added vanilla as sweeter. If you are designing reduced calorie products and are cutting back on sugar in order to achieve that goal, you might be able to add a little bit more vanilla to enhance the sweetness perception.[9]

15.     Another reason for increased popularity and usage of vanilla is "consumer demand

---

[4] D. Havkin-Frenkel, et al. "A comprehensive study of composition and evaluation of vanilla extracts in US retail stores," Handbook of Vanilla Science and Technology (2019): 349-366)
[5] Simran Sethi, The Bittersweet Story of Vanilla, Smithsonian.com, Apr. 3, 2017
[6] Syrmise, Vanilla – A Global Favorite Flavor
[7] New Uses for Vanilla, Bakto Flavors. Why Is Vanilla Added To Recipes? April 17, 2015  Melissa
[8] Linda Milo, Flavor Creations: Science Conjures the Essence of Flavors, Prepared Foods, Mar. 1, 2001.
[9] Laura Brandt, The Creation and Use of Vanilla, Natural Products Insider, Mar. 1, 1996.

for all-natural foods and beverages."[10]

III. Vanilla is Constantly Subject to Efforts at Imitation Due to High Demand

16.     In 1908, E. M. Chace, Assistant Chief of the Foods Division of the U.S. Department of Agriculture's Bureau of Chemistry, noted "There is at least three times as much vanilla consumed [in the United States] as all other flavors together."[11]

17.     The global landscape since The Pure Food and Drugs Act, enacted in 1906 to "protect consumer health and prevent commercial fraud," has changed little.[12]

18.     Daily headlines alert us to this resurgent international threat of "food fraud"– whether olive oil made from cottonseeds to the horsemeat scandal in the European Union.[13]

19.     In terms of quality, vanilla is considered  a "high-risk product because of the multiple market impact factors such as natural disasters in the source regions, unstable production, wide variability of quality and value of vanilla flavorings etc."[14]

20.     Due to its versatility, demand and high value – second most expensive flavoring ingredient (after saffron) – there have been continual attempts to dilute, imitate, adulterate and "extend" vanilla.[15]

---

[10] Melody M. Bomgardner, The problem with vanilla After vowing to go natural, food brands face a shortage of the favored flavor, Chemical & Engineering News, American Chemical Society ("ACS"), Vol. 94, Issue 36 pp. 38-42, Sept. 12, 2016

[11] E. M. Chace, "The Manufacture of Flavoring Extracts," Yearbook of the United States Department of Agriculture 1908 (Washington, DC: Government Printing Office, 1909) pp.333–42, 333 quoted in Nadia Berenstein, "Making a global sensation: Vanilla flavor, synthetic chemistry, and the meanings of purity," History of Science 54.4 (2016): 399-424 at 399.

[12] Berenstein, 412.

[13] Jenny Eagle, 'Today's complex, fragmented, global food supply chains have led to an increase in food fraud', FoodNavigator.com, Feb. 20, 2019; M. Dourado et al., Do we really know what's in our plate?. Annals of Medicine, 51(sup1), 179-179 (May 2019); Aline Wisniewski et al., "How to tackle food fraud in official food control authorities in Germany." Journal of Consumer Protection and Food Safety: 1-10. June 11, 2019.

[14] Société Générale de Surveillance SA, ("SGS "), Authenticity Testing of Vanilla Flavors – Alignment Between Source Material, Claims and Regulation, May 2019.

[15] "Extend" in the context of flavoring is a modern and polite way to say "dilute" or "adulterate" – to make what is being "extended" go farther.  Since "dilute" and "adulterate" have a deserved negative connotation, the flavor industry and technical trade literature use the euphemistic term, "extend."

21.    Though "food fraud" has no agreed-upon definition and the typologies and categories often overlap, it encompasses a broad and ever-expanding range of techniques where the end result is consumers getting less than what they bargained for.

22.    For vanilla, the following general typologies of food fraud are illustrated in the left column while examples of these practices as applied to vanilla are in the right column..[16]

| Type | Example |
|------|---------|
| Cheating on analytical tests by containing markers specifically tested for | Manipulation of the carbon isotope ratios to produce synthetic vanillin with similar carbon isotope composition to natural vanilla |
| Cheating by giving consumers the impression the food or ingredient is present in greater amounts and/or higher quality form than it actually contains | Ground vanilla beans and/or seeds to provide visual appeal as "specks" so consumer thinks they are a result of the product containing real vanilla bean, when the ground beans have been exhausted of flavor, and any vanilla flavor tasted may not even be due to the presence of real vanilla |
| Substitution or Replacement a food product/ingredient with an alternate food product/ingredient of lower quality | Tonka beans, which are banned from entry to the United States, instead of vanilla beans. Coumarin, phytochemical found in Tonka beans, to increase the vanilla flavor perception. |
| Coloring agents to produce a more attractive color | Caramel in vanilla extracts to darken the substance's color additives like caramel to enhance the hue of an imitation vanilla so it more closely resembles real vanilla.[17] |

[16] https://www.ifsqn.com/fsf/Understanding%20Food%20Fraud.pdf
[17] Renée Johnson, "Food fraud and economically motivated adulteration of food and food ingredients." Congressional Research Service R43358, January 10, 2014.

| Addition of less expensive substitute ingredient to mimic flavor of more valuable component | Synthetically produced ethyl vanillin, derived from wood pulp, tree bark or coal tar. |
| --- | --- |
| Ingredient list deception[18] | subtle, yet deliberate misidentification and obfuscation of a product's components and qualities as they appear on the ingredient list – "ground vanilla beans" as containing actual vanilla flavor when they are devoid of any naturally occurring vanilla flavor. |
| Diluting/Extending | Combination with a variety of flavoring substances such as propenyl guaethol ("Vanitrope"), a "flavoring agent [, also] unconnected to vanilla beans or vanillin, but unmistakably producing the sensation of vanilla."[19] |
| | "Spiking" of vanilla through addition of natural flavors which simulate the taste of vanilla, contrary to consumer expectations and law. |

23.    As shown below, the "food fraud" typologies evident in the Products can be classified as

(1) Cheating by giving consumers the impression the food or ingredient is present in greater amounts and/or higher quality form than it actually contains; and

(2) Ingredient list deception.

IV. Representations on Products

24.    The front label (below, with Nutrition Facts) statements and images include (1)

---

[18] Recent example of this would be "evaporated cane juice" as a more healthful sounding term to consumers to identify sugar
[19] Berenstein, 423.

"Protein & Fiber Hot Oatmeal," (2) "Madagascar Vanilla, Almonds, Pecans," (3) "*Naturally Flavored*," (4) vignettes of oatmeal cup sprinkled with almonds and pecans, (5) vanilla beans and vanilla orchid adjacent to oatmeal cup and (6) "10g Protein," "5g Fiber," and "190 Calories."



25.    The Products are represented as containing vanilla through the statement, "Madagascar Vanilla," the vanilla bean and vanilla flower vignette on the front labels.

## V.  Ground Vanilla Beans is Misleading

26.    A reasonable consumer will expect the Product to contain the flavor imparted by *actual* ground vanilla beans.

### A.  Ingredient List Amplifies, Instead of Curing, the Deception

27.    Though mainstream commentators promote the "ingredient list" as part of a food labeling unaffected by marketing and promotion, this "neutral" and "factual" space has become a contested area, to the detriment of consumers.

28.    The Product's ingredient list appears to confirm the front label representations about

8

the presence of actual vanilla flavor in the Products, imparted by "Ground Vanilla Beans."



Ingredients:  Whole Grain Blend (Rolled Oats, Steel Cut Oats, Red Quinoa), Dried Cane Syrup, Isolated Soy Protein, Chicory Root Fiber, Natural Flavors, Almonds, Pecans, Sea Salt, Ground Vanilla Beans.

29.    Consumers will see the representations as to the presence of Madagascar Vanilla on the front and should they seek to dispel any ambiguity through review of the ingredient list, lest it be thought their expectation of actual vanilla in an oatmeal cup was implausible, they will only be further misled.

30.    While consumers of the Products can physically taste and discern the presence of actual almonds and pecans because these are solid foods with defined and understood texture, the same is not true with respect to vanilla.

31.    This is because vanilla is not consumed or added to foods for its nutritive value, but exclusively for its flavor, and because it is a liquid derived from the vanilla plant, defined by law as "the total sapid and odorous principles extractable from one unit weight of vanilla beans."[20]

32.    The presence of "ground vanilla beans" on the ingredient list is deceptive and misleading because it gives the impression this ingredient contributes flavor because of the front label claim of "Madagascar Vanilla" coupled with the presence of almonds and pecans.

33.    This contributes to the false expectation that all three of these "called-out" ingredients contribute to the sensory qualities of the Products, *viz*, taste (vanilla), nutritive value

---

[20] 21 C.F.R. §169.3(c)

9

(almonds, pecans).

34.    The presence of "ground vanilla beans" as the last ingredient on the ingredient list is deceptive and misleading because this ingredient is present in the smallest amount by weight, based on the descending order of predominance by weight of the ingredients.

35.    The presence of "ground vanilla beans" on the ingredient list is deceptive and misleading because the reasonable consumer is not likely to be knowledgeable of the commercial practices of the secretive and opaque vanilla flavor industry.

B.    Ground Vanilla Beans in Products are Exhausted or Spent Vanilla Beans

36.    Exhausted vanilla beans are produced from previously extracted vanilla beans using a drying, chopping and sining process… and act strictly in a cosmetic manner, as they are flavorless."[21]

37.    In certain instances, exhausted or spent vanilla beans will be repurposed and infused with synthetic vanillin or other flavoring substances and then incorporated into food.

38.    However, they still would have no connection to actual vanilla and actual vanilla beans which have not had all the flavor extracted from them before they were ground up and used.

39.    According to Cook's Vanilla,

When flavor houses extract vanilla beans to make vanilla extract, the goal is to extract all possible flavor from the bean, including its seeds. After the vanilla extract has percolated for an optimal time, the vanilla bean pods and seeds sink to the bottom and are filtered from the extract. As a final step, the vanilla bean seeds are sifted from the spent vanilla bean pods. The resulting bean pods and seeds are known as "exhausted," because all flavor has been extracted.[22]

40.    According to one company that trades in vanilla products, "[T]he demand for

---

[21] Chat Nielsen, Jr., The Story of Vanilla, p. 15.
[22] Cook's Blog, Vanilla Bean Seeds: A Troubling New Trend, June 13, 2019.

exhausted or spent vanilla, (vanilla waste after extraction), and vanilla seeds sifted from this material has exploded over the last 12 months" because the amount of actual vanilla has been at low levels, in part due to climactic conditions.[23]

41.   It is plausible and likely that the ground vanilla beans in the Products are in fact, exhausted, or spent vanilla beans because:

(1)  the use of unexhausted ground vanilla beans would result in inconsistent flavoring from batch to batch;

(2)  there are not enough unextracted vanilla beans available in commerce to be used on a mass production scale in products like here; and

(3)  microbiological and other issues related to processing weigh against the use of ground vanilla beans which have not been exhausted.

C.  <u>If Any Vanilla Flavor from Vanilla is Present, it is Provided by "Natural Flavors"</u>

42.   The front label and ingredient list indicate the Products are:

(1) "naturally flavored" and contain "natural flavors;" and

(2) contain vanilla through the statement, "Madagascar Vanilla," the vanilla pod and flower vignette on the front labels and "ground vanilla beans" on the ingredient list.

43.   The "naturally flavored" designation on the front label does not disclaim or disavow the presence of real vanilla because the front label lists "Madagascar Vanilla, Almonds, Pecans."

44.   Since consumers can confirm through the eating properties the Products actually contain almonds and pecans, because these are solid foods, *supra*, they will expect vanilla flavor from the actual ground vanilla beans, in addition to any vanilla contained in the natural flavors.

---

[23] Aust & Hachman Canada, May 2019 Update.

45.    Accepting as true that "natural flavors" contains actual vanilla extract or flavor, in addition to other natural flavors ("Vanilla WONF"), the reasonable consumer is justified in expecting the Products contain <u>more</u> vanilla in the form of the <u>ground vanilla beans</u>.

46.    While consumers of the Products may taste the hulls or shells of ground vanilla beans, the flavor they simultaneously will recognize will be from the "Natural Flavors" in the Products, not the ground vanilla beans.

VI. Conclusion

47.    The proportion of the characterizing component, vanilla, has a material bearing on price or consumer acceptance of the Products because it is more expensive and desired by consumers.

48.    Had Plaintiff and Class members known the truth about the Products, they would not have bought the Product or would have paid less for it.

49.    The Products contain other representations which are misleading and deceptive.

50.    As a result of the false and misleading labeling, the Products are sold at premium prices – no less than $2.99 per individual serving of 1.76 oz (50g) or $1.83 when purchased in packs of six individual cups, excluding tax – compared to other similar products represented in a non-misleading way.

<u>Jurisdiction and Venue</u>

51.    Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2).

52.    Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

53.    This court has personal jurisdiction over defendant because it conducts and transacts

business, contracts to supply and supplies goods within New York.

54.    Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and State.

55.    A substantial part of events and omissions giving rise to the claims occurred in this District.

Parties

56.    Named Plaintiff is a citizen of Queens County, New York.

57.    Jane Doe plaintiffs are citizens of the 49 states for which the identity of a named plaintiff has not been disclosed, but who were affected in the same manner as the Named Plaintiffs.

58.    The allegations as related to laws of other states where no named plaintiff has been disclosed serves as a placeholder upon joinder or amendment.

59.    Defendant is a Delaware corporation with a principal place of business in Downers Grove, Illinois (DuPage County).

60.    Defendant is a wholly-owned subsidiary of Glanbia PLC ("public limited company"), an Irish food and beverage conglomerate with specialties in nutrition and dairy products.

61.    During the class period, Named and Jane Doe Plaintiffs purchased one or more of the Products for personal use, consumption or application with the representations described herein, for no less than the price indicated, *supra*, excluding tax, within their districts and/or states.

62.    Named and Jane Doe Plaintiffs purchased the Products based upon the representations on the packaging.

63.    Named and Jane Doe Plaintiffs would consider purchasing the Products again if there were assurances that the Products' representations were no longer misleading.

Class Allegations

13

64.   The classes will consist of all consumers in all 50 states with sub-classes for the individual states.

65.   The present complaint contains Named Plaintiffs from: New York, who will represent his/her/their state sub-classes of persons who purchased any Products containing the actionable representations during the statutes of limitation.

66.   Common questions of law or fact predominate and include whether the representations were likely to deceive reasonable consumers and if Named and Jane Doe Plaintiffs and class members are entitled to damages.

67.   Named and Jane Doe Plaintiffs' claims and the basis for relief are typical to other members because all were subjected to the same representations.

68.   Named Plaintiffs are adequate representatives because their interests do not conflict with other members.

69.   No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

70.   Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest.

71.   Named and Jane Doe Plaintiffs' counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

72.   Named and Jane Doe Plaintiffs seek class-wide injunctive relief because the practices continue.

<u>New York General Business Law ("GBL") §§ 349 & 350, California Consumers<br>Legal Remedies Act, Civ. Code §§ 1750-1785 ("CLRA")<br>and Consumer Protection Statutes of Other States and Territories</u>

73.   Named and Jane Doe Plaintiffs assert causes of action under the consumer protection statutes of the all 50 states, with Named Plaintiff asserting the consumer protection laws of his or

her individual state.

a. Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1, *et. seq.*;
b. Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et. seq.*;
c. Arizona Consumer Fraud Act, Ariz. Rev. Stat. Ann. §§ 44-1521 *et seq.*;
d. Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et. seq.*;
e. California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* and Unfair Competition Law, Cal. Bus. Prof. Code §§ 17200- 17210 *et. seq.*;
f. Colorado Consumer Protection Act, Colo Rev. Stat § 6-1-101, *et. seq.*;
g. Connecticut Unfair Trade Practices Act, Conn. Gen Stat § 42-110a, *et. seq.*;
h. Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et. seq.*;
i. District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et. seq.*;
j. Florida Deceptive and Unfair Trade Practices, Act *Florida Statutes* § 501.201, *et. seq.*;
k. Georgia Fair Business Practices Act, §10-1-390 *et. seq.*;
l. Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statutes § 480 1, *et. seq.* and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statute § 481A-1, *et. seq.*;
m. Idaho Consumer Protection Act, Idaho Code § 48-601, *et. seq.*;
n. Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et. seq.*;
o. Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5-1 *et. seq.*;
p. Iowa Code §§ 714.16 *et. seq.*;
q. Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et. seq.*;
r. Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et. seq.*, and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann § 365.020, *et. seq.*;
s. Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et. seq.*;
t. Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et. seq.*, and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et. seq.*;
u. Maryland Consumer Protection Act, Md. Code, Com. Law § 13-101 *et seq.*;
v. Massachusetts Unfair and Deceptive Practices Act, Mass. Gen Laws Ch. 93A;
w. Michigan Consumer Protection Act, §§ 445.901, *et. seq.*;
x. Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et. seq.*; and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et. seq.*;
y. Mississippi Consumer Protection Act, Miss. Code An. §§ 75-24-1, *et. seq.*;
z. Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*;
aa. Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code § 30-14-101, *et. seq.*;
bb. Nebraska Consumer Protection Act, neb. Rev. Stat. § 59 1601 *et. seq.*, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et. seq.*;
cc. Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et. seq.*;
dd. New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et. seq.*;
ee. New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8 1, *et. seq.*;
ff. New Mexico Unfair Practices Act, N.M. Sta. Ann. §§ 57 12 1, *et. seq.*;
gg. New York General Business Law ("GBL") §§ 349 & 350;
hh. North Carolina
ii. North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et. seq.*;

jj.  Ohio Rev. Code Ann. §§ 1345.02 and 1345.03; Ohio Admin. Code §§ 109;

kk. Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et. seq.*;

ll.  Oregon Unfair Trade Practices Act, Ore. Rev. Stat. § 646.608(e) & (g);

mm. Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1 *et. seq.*;

nn. Rhode Island Unfair Trade Practices and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1 *et. seq.*;

oo. South Carolina Unfair Trade Practices Act, S.C. Code Law § 39-5-10, *et. seq.*;

pp. South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 1, *et. seq.*;

qq. Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et. seq.*;

rr.  Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. §§ 17.41 *et. seq.*;

ss.  Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-1 *et. seq.*;

tt.  Vermont Consumer Fraud Act, Vt. Stat. Ann. Tit. 9, § 2451, *et. seq.*;

uu. Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196 *et. seq.*;

vv. Washington Consumer Fraud Act, Wash. Rev. Code § 19.86/0101, *et. seq.*;

ww. West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et. seq.*;

xx. Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100.18, *et. seq.*; and

yy. Wyoming Consumer Protection Act, Wyo. Stat. Ann.§§ 40-12-101 *et. seq.*;

74.  Named and Jane Doe Plaintiffs and class members assert causes of action under the consumer protection laws of their States.

75.  Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because (1) it gives the impression to consumers the Products contain more of the characterizing ingredients than they actually do and (2) the ingredient list does not dispel ambiguity but reinforces the front-label impression as to a greater amount of the characterizing ingredients.

76.  Defendant's acts, practices, advertising, labeling, packaging, representations and omissions are not unique to the parties and have a broader impact on the public.

77.  Named Plaintiffs and Jane Doe Plaintiffs and class members desired to purchase products which were as described by defendant and expected by reasonable consumers, given the product type.

78.  After mailing appropriate notice and demand, Named and/or Jane Doe Plaintiffs who reside in a State where notice is required prior to seeking damages under that State's Consumer

Protection Statutes, will have mailed and/or have amended this complaint to request damages. Cal. Civil Code § 1782(a), (d); Mass. UDAP, Mass. Gen Laws Ch. 93A, etc.

79.     Named and/or Jane Doe Plaintiffs from California will seek injunctive and equitable relief and attorney fees for that State's sub-class for CLRA violations. Civ. Code § 1780(a); Cal. Bus. & Prof. Code § 17203.

80.     The representations and omissions were relied on by Named and Jane Doe Plaintiffs and class members, who paid more than they would have, causing damages.

<u>Negligent Misrepresentation</u>

81.     Named and Jane Doe Plaintiffs and class members incorporate by reference all preceding paragraphs.

82.     Defendant misrepresented the misrepresented the substantive, quality, compositional, health, organoleptic and/or nutritional attributes of the Products through representing the characterizing ingredient was present in greater amount than it actually was.

83.     Defendant had a duty to disclose and/or provide non-deceptive labeling of the Products and knew or should have known same were false or misleading.

84.     This duty is based on defendant's position as an entity which has held itself out as having special knowledge in the production, service and/or sale of the product type.

85.     The representations took advantage of cognitive shortcuts made by consumers at the point-of-sale and their trust placed in defendant, a well-known and widely recognized and respected brand in this sector for this type of product.

86.     Named and Jane Doe Plaintiffs and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

87.    Named and Jane Doe Plaintiffs and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

Breaches of Express Warranty Implied Warranty of Merchantability and<br>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, <em>et seq.</em>

88.    Named and Jane Doe Plaintiffs incorporate by references all preceding paragraphs.

89.    Defendant manufactures and sells products which contain a characterizing ingredient or flavor which is desired by consumers.

90.    The Products warranted to Named and Jane Doe Plaintiffs and class members that they possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which they did not.

91.    Defendant's ingredient list informed Named and Jane Doe Plaintiffs the Products contained flavoring from actual vanilla beans, *not only from the ingredient designated as "Natural Flavors,"* but also from the "ground vanilla beans."

92.    Defendant had a duty to disclose and/or provide a non-deceptive description of the Products' ingredients and knew or should have known same were false or misleading.

93.    This duty is based, in part, on defendant's position as one of the most recognized nutritional companies in the world.

94.    The Products warranted to Named and Jane Doe Plaintiffs and class members that the characterizing ingredient, emphasized by the Product's name, description, label and/or website and marketing, was (1) present in its unmodified, unexhausted form derived from ground vanilla beans from which all flavor had not been extracted and/or (2) contained an amount of said ingredient sufficient to independently characterize the Products.

95.    Named and Jane Doe Plaintiffs desired to purchase products which were as described by defendant.

96.     The Products did not conform to their affirmations of fact and promises, wholly due to defendant's actions and were not merchantable.

97.     To the extent notice may be required, Named and Jane Doe Plaintiffs have or intend to send notice to defendant and reserve all rights to amendment of this complaint.

98.     Named and Jane Doe Plaintiffs and class members relied on defendant's claims, paying more than they would have.

<u>Fraud</u>

99.     Named and Jane Doe Plaintiffs incorporate by references all preceding paragraphs.

100.    Defendant's purpose was to sell a product which contained a valuable and desired characterizing ingredient or flavor, and represent the Products were exclusively or predominantly flavored from that food, and contained sufficient independent amounts of same such that they would accurately be described by the product name, representations and marketing.

101.    The Products were not flavored exclusively from the characterizing ingredient because the "Natural Flavors" listed on the ingredient list is, at best, a placeholder for an ingredient that is sometimes identified as vanilla with other natural flavors ("vanilla wonf").

102.    Defendant's fraudulent intent is evinced by its failure to accurately identify the Products' ingredients when it was the sole entity in a position to disclose this but chose a name which did not accurately describe the composition and qualities of this ingredient.

103.    Defendant's intent was to secure economic advantage in the marketplace against competitors by appealing to consumers who value products with this characterizing ingredient for the above-described reasons.

104.    Named and Jane Doe Plaintiffs and class members observed and relied on defendant's claims, causing them to pay more than they would have, entitling them to damages.

Unjust Enrichment

105.   Named and Jane Doe Plaintiffs incorporate by references all preceding paragraphs.

106.   Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Named and Jane Doe Plaintiffs demand a jury trial on all issues.

**WHEREFORE,** Named and Jane Doe Plaintiffs pray for judgment:

1.   Declaring this a proper class action, certifying named plaintiffs as representatives and the undersigned as counsel for the class;

2.   Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3.   Injunctive relief to remove and/or refrain from the challenged representations, restitution and disgorgement for members of the State Subclasses pursuant to the consumer protection laws of their States;

4.   Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and consumer protection law claims, and other statutory claims;

5.   Awarding costs and expenses, including reasonable fees for plaintiffs' attorneys and experts; and

6.   Other and further relief as the Court deems just and proper.

Dated:   August 7, 2019

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan

Spencer Sheehan (SS-8533)
505 Northern Blvd., Suite 311

Great Neck, NY 11021
(516) 303-0552
spencer@spencersheehan.com
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056

1:19-cv-04566
United States District Court
Eastern District of New York

Howard Haut, Jane Doe individually and on behalf of all others similarly situated

Plaintiff

- against -

Glanbia Performance Nutrition (Manufacturing), Inc.

Defendant

# Complaint

```
Sheehan & Associates, P.C.
 505 Northern Blvd., #311
   Great Neck, NY 11021
   Tel: (516) 303-0552
   Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  August 7, 2019

/s/ Spencer Sheehan
Spencer Sheehan